MATTER OF BROWNE

In Visa Petition Proceedings

LOS N-6064

*Decided by District Director June 5, 1967*

Petition by an internationally-known motion picture company to accord beneficiary, an actress of distinguished merit and ability whose services are desired in a forthcoming motion picture, nonimmigrant classification under section 101(a) (15) (H) (i), Immigration and Nationality Act, is granted since a comprehensive and objective analysis of all the evidence, including contradictory opinions furnished by parties who may have opposing interests, establishes that the relationship of beneficiary's proposed role with the starring roles and with the aura, tone, and characterization juxtaposition sought to be achieved by the writer and the producer-director requires an actress of distinguished merit and ability to attain the desired objectives.

The petitioner, an internationally known, reputable, leading motion picture company, has filed the instant petition seeking classification under section 101(a) (15) (H) (i) for an actress, Coral Edith Pearman, also known professionally as Coral Browne, hereinafter referred to as the beneficiary. Her services are desired by the petitioner in a forthcoming motion picture entitled, "The Legend of Lylah Clare", to enact the role of one called "Molly Luther".

In order to obtain the requested classification, the petitioner has the burden of establishing that the beneficiary is an actress of distinguished merit and ability and that the role she is to perform requires an actress of distinguished merit and ability. In support of its petition and its burden of proof, the petitioner, by its Assistant Secretary, has submitted an affidavit in which it alleges that the beneficiary's services are required from on or about May 29, 1967, for preliminary services prior to commencement of principal photography which is scheduled to commence on or about June 12, 1967; that the beneficiary's services will be required for approximately two months; that for her services, the beneficiary will be paid the minimum sum of £3,000 ($8,400) which covers an initial three week guaranteed service period, and an additional £1,000 ($2,800) per week for each week thereafter

that her services are required; that in addition, the beneficiary will be furnished first class round trip transportation from London, England to Los Angeles, California, plus $750 per week living expenses for the entire period that her services are required. The petitioner further attests in its affidavit that the beneficiary is an actress of distinguished merit and ability in motion pictures and in the theatre, both in the United States and abroad; that she co-starred with Peter O'Toole and Omar Sharif in "Night of the Generals" in 1967; co-starred with Donald Pleasence in the film "Dr. Crippen" in 1964; and co-starred with Rosalind Russell and Forrest Tucker in the film "Auntie Mame" in 1958. The petitioner lists seven plays in which the beneficiary has performed on the legitimate stage.

In further support of its petition and its burden of proof, the petitioner has submitted an affidavit executed by Mr. Robert Aldrich who will be the producer and director of the motion picture "The Legend of Lylah Clare" in which he states that he has been engaged as a producer and director in the motion picture industry for in excess of twenty-five years; that he has directed many outstanding motion pictures, including "The Dirty Dozen", "Flight of the Phoenix", "Whatever Happened to Baby Jane", "Hush, Hush, Sweet Charlotte", "Vera Cruz", "Big Knife", "Attack", and "Sodom and Gomorrah"; that his pictures have been awarded fourteen Academy Award nominations; that the beneficiary is a lady of important theatrical background who previously had been admitted to the United States as an actress of distinguished merit and ability to perform on the legitimate stage in "Right Honorable Gentleman", and "Tamburlaine, The Great", and in the film "Auntie Mame"; that in the proposed role for which her classification is now desired, she will appear in 29 scenes, covering 21½ pages of the script and having 27 speeches; that the beneficiary in effect will be playing what would amount to a cameo role especially fitted for her appearance and personality; that it was necessary to make a special trip to England to persuade her to undertake this vignette role; that one of her conditions of acceptance was that this be considered a cameo role and give her special billing in last place of the cast with special wording, such as: "and Coral Browne", "Guest Star—Coral Browne", or "Coral Browne as Molly Luther"; that the part the beneficiary is to play requires an English woman with pseudo-aristocratic pretensions and airs, which would be most difficult for any one to play except a qualified English actress of distinction, who would give the role the "air" of the British star of the period.

In support of Mr. Aldrich's statement that the beneficiary is a lady of important theatrical background, he attaches to his affidavit an

extract (page 401) of a publication entitled, "Who's Who in the Theatre".

In accordance with the directive of 8 CFR 214.2(h)(2)(i), the District Director consulted the Screen Actors Guild, an organization of actors and actresses active in the motion picture industry, for the purpose of obtaining the advisory opinion of the organization with regard to the qualifications of the beneficiary and the nature of the services to be performed by her. To assist the Screen Actors Guild in furnishing its advice, the script of the proposed motion picture was provided. In order to establish its expertise in the field of motion picture acting and the qualification of its officers to pass judgment and to evaluate whether certain actors or actresses are of distinguished merit and ability, and as to whether a particular role requires such distinguished merit and ability, a communication dated May 22, 1967, was submitted to this office in response to a request of May 16, 1967. In this communication, Mr. John L. Dales, National Executive Secretary of the Screen Actors Guild, advised that its Board of Directors consisted of active and highly trained and skilled professional actors who have been elected to govern the affairs of their fellow actors in the Screen Actors Guild; that Guild executives are instructed to, and do, freely call on the knowledge and opinion of these officers and Board members; that the National Executive Secretary, John L. Dales, affiliated with the Guild in October of 1937, has been intimately associated with actors and the motion picture and television industry continuously since then, is a member of the Academy of Motion Picture Arts and Sciences, whose work requires close contact not only with members of the Guild, but with other talent guilds, such as the Writers and Directors, and with the producing companies; that Chester L. Midgen, the Guild's Associate National Executive Secretary, came to the Guild in 1952 from the National Labor Relations Board where he was a specialist in entertainment labor law problems, maintains extensive contacts with the talent agencies and the casting offices of all studios from all of which sources he gathers available information concerning foreign talent; that Mr. A. Kendall Orsatti, Executive Assistant for the Screen Actors Guild, was employed from 1956 to 1957 by Sabre Motion Picture Productions, from 1958 to 1959 by Ror-Vic Productions at the Desilu Studios, in 1960 he served as a representative for the American Federation of Television and Radio Artists, and in 1961, joined the Guild as its Executive Assistant; that Executive Assistant James L. Nissen, came to the Guild in March of 1957 directly from Southwestern Law School where he obtained an L.L. B. degree.

The letter of May 22, 1967, states that all of the individuals mentioned in the communication, in addition to their own experience and

314

knowledge, have available to them and make use of the extensive knowledge and advice of:

1. The Guild Board of Directors, the Guild membership, consisting of actors of all categories, including many who are also producers and directors;
2. All talent agencies franchised by the Screen Actors Guild which represent under individual contracts all American and most foreign artists;
3. The foreign actors' unions around the world with whom the Guild maintains liaison, particularly in the United Kingdom;
4. The casting agencies in the motion picture industry operating either independently or exclusively for given studios. Constant contact is maintained with these offices, avoiding only the one involved in a particular case. Inasmuch as Guild executives seek only public and professional knowledge of foreign artists, this avenue of aid is also constantly open and extensively used.
5. An extensive and current subscription list of periodicals and literature on motion picture and television around the world maintained by the Screen Actors Guild in carrying out its obligation in the policing of its residual payment contractual requirements, both domestic and foreign. They also have available the library of the Academy of Motion Picture Arts and Sciences, probably the most extensive film library in America today.

In its written advisory opinion submitted in affidavit form dated May 31, 1967, signed by John L. Dales, Chester L. Migden, and A. Kendall Orsatti, it is stated that each of the individuals signing the affidavit has had extensive knowledge and background of the entertainment industry for a combined total in excess of fifty years, of which Mr. Dales alone totals thirty of those years; that the business experience of the deponents relates to actors, their roles, their conditions, their experience, their abilities, their utilization and functions in the motion picture industry; that the deponents are of the firm opinion that, although Miss Browne is an actress of distinguished merit and ability who is coming temporarily to the United States to perform temporary services, the services are by no means of an exceptional nature nor do they require such merit and ability; that this opinion is shared by the professional actors who are members of the Guild's Executive Committee; that the three deponents have read the script of the photoplay and have examined carefully the role of "Molly Luther"; that the role is that of a syndicated columnist involving 27 lines, the majority of which take place at a press conference, the speeches being singularly simple and, in the main, involving single sentences; that there is nothing particularly unique, demanding or difficult in the role or the dialogue; that in the opinion of the deponents the role does not involve anything approaching services of an exceptional nature; on the contrary the role appears fairly routine and ordinary, falling in the category of a small character role requiring acting ability but not acting ability on the scale of distinguished

315

merit and ability as that concept was intended or within the fair meaning of the statute; that they have little question but that the characterization required could be readily portrayed by a considerable number of character actresses in this country. In brief and in summation, the consulting organization's advice and expert opinion is that services of an exceptional nature are not involved nor is distinguished merit and ability required in connection with the role for which the petitioner desires to employ the beneficiary.

It is important to note at this point that if the role requires an actress of exceptional merit and ability, the instant petition must be approved even though actresses having such merit and ability are available in the United States to perform the role. Unlike classification under section 101(a)(15)(H)(ii), unavailability of like labor is not a prerequisite.

As is occasionally the case, we are here confronted with conflicting expert opinion as to one portion of the proof required to be established by the petitioner. The difference of expert opinion found in the instant case clearly indicates the propriety and wisdom of 8 CFR 214.2 (h)(2)(i) in requiring as much objective evidence as possible on which to predicate the necessary decision. It clearly appears from the evidence introduced by the petitioner that the beneficiary is an actress of distinguished merit and ability and the consulted organization, expert in the field, admits and concedes this. The petitioning company whose large financial investment is involved in this motion picture asserts that they require the beneficiary's services for the role to be performed. This assertion is confirmed by the amount of money they have contracted to pay in salary, living expenses, and transportation. The director-producer of this motion picture, a man obviously of stature in the industry and in his particular sphere with the industry, has stated that the role requires an actress of distinguished merit and ability for reasons clearly set forth in his affidavit. It must be recognized that each of the opposing experts is asserting what they honestly believe to be the truth. It must also be recognized that either may have its opinion influenced by its own needs and the reasons for its existence. The petitioner and the producer are concerned with making as fine a motion picture as possible with the greatest amount of profit; the Screen Actors Guild is concerned, and properly so, with seeing to it that its members are employed before importing actors into the United States for purposes of employment.

The final determination of whether the statutory requirements have been met is inherently contingent upon a comprehensive and objective analysis of all of the evidence, including the reading of the role to be portrayed in the context of the entire script. Such evidence is

not to be confined to facts and conclusion submitted by the parties directly or indirectly involved, including any professional group whose opinion has been solicited, but must also include any other peripheral or collateral facts as to which the Service has either actual or constructive knowledge bearing on the issue. This would include the opinions of the petitioner, their business and professional reputation, the extent of their financial obligations involved in the particular production, the opinion of any union, other organization, recognized critics, or other experts in the field in which the alien is to be engaged together with the necessary background information establishing the basis for and necessary expertise in the particular field. A petition of the type here involved necessarily entails a certain amount of subjectivity which must enter into the ultimate conclusion reached. It must be emphasized, however, that neither individually nor collectively are these peripheral or collateral matters to be completely dispositive of the legal issue to be determined.

The evidence introduced by the petitioner and the valued opinion by the recognized experts representing the Screen Actors Guild have been carefully considered and evaluated together with the peripheral and collateral factors referred to above. The entire script of the proposed motion picture has been carefully perused with particular attention to the role of "Molly Luther" described by the petitioner as a "cameo" role.

A "cameo" role is a word of art employed in the industry to indicate (1) a portrayal of such poignancy or characterization as to stand out clearly and vividly in the eyes of the viewer without any necessary relationship to the size of the part in the overall script or, (2) a portrayal of a characterization stereotyped in the eyes of the viewer as so closely connected with a specific actor either because of his prior roles or because of his public image as to preclude any other actor from being able to fill the part. For example, the viewing public's well known awareness of the byplay between Bing Crosby and Bob Hope would clearly indicate that only Bing Crosby could carry off the small part of appearing in the last scene of a film walking off with the female lead whom Bob Hope has been pursuing throughout the entire picture.

The independent reading of the proposed script clearly evidences the fact that the role of "Molly Luther" is small, appearing on portions of 21½ pages of a 139 page script involving in all some 27 lines of dialogue. It appears, however, that this role provides a necessary catalytic element to the forward progress and continuity of the story and to the role of the principal female actress. One practical test as to whether a role requires an actor of distinguished merit and ability

317

might very well be whether the motion picture story or another characterization would be substantially impaired if the role were omitted. Applying this test to the role of "Molly Luther", I am constrained to conclude that a substantial impairment would result, especially in the "tone" sought to be reached in the scenes in which "Molly Luther" appears. Obviously, the actress makes the role as fully as the role might make the actress. Also obviously, an actress of distinguished merit and ability in a role such as "Molly Luther" might well be the recipient of an Academy nomination. The fact that a lesser actress could do the part in a less significant manner and without reaching the heights of an award, is not dispositive of the issue as to whether the role requires an actress of distinguished merit and ability. The relationship of this role with the starring roles and with the aura, tone, and characterization juxtaposition sought to be achieved by the writer and the producer-director, leads me to the conclusion that this role does require an actress of distinguished merit and ability to reach the objectives sought to be achieved. It having been established and conceded that the beneficiary is an actress of distinguished merit and ability, it follows that the petition should be and is hereby approved.

**ORDER:** It is ordered that the visa petition filed by Metro-Goldwyn-Mayer, Inc. to classify Coral Edith Pearman, professionally known as Coral Browne, as a nonimmigrant temporary worker under section 101(a)(15)(H)(i), is approved.